1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLAYTON STEFAN FREEMAN,<br><br>                              Plaintiff,<br><br>v.<br><br>M.W. REID WELDING, INC. d/b/a<br>SOUTH BAY WELDING<br><br>                              Defendant. | Case No.:  22-CV-01553-RSH-DDL<br><br><br>**ORDER GRANTING MOTION TO<br>ENTER CONSENT DECREE**<br><br><br>**[ECF No. 20]** |

On October 11, 2022, Plaintiff Clayton Stefan Freeman filed the instant civil action against Defendant M.W. Reid Welding, Inc. d/b/a South Bay Welding, alleging violations of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA") arising out of Defendant's operations in El Cajon, California. ECF No. 1. On April 3, 2023, the Parties informed the Court that they had reached a settlement resolving all claims, contingent upon the expiration of a 45-day day federal agency review period of their proposed consent decree (hereinafter, the "Consent Decree").[1] On April 4, 2023, the Department of Justice

---

[1]    The Clean Water Act provides that "[n]o consent judgment shall be entered in an action in which the United States is not a party prior to 45 days following the receipt of a

("DOJ") advised the Parties that it received the Consent Decree and that it was the DOJ's position that it had until May 18, 2023 to review. ECF No. 16 at 2. That 45-day review period has lapsed, and to date, the DOJ has not objected to the entry of the Consent Decree. *See* ECF No. 20 at 2; ECF No. 23 at 8.

Pending is the Parties' joint motion to enter their Consent Decree (hereinafter, the "Motion").[2] ECF No. 20. At the Court's direction, the Parties filed a joint supplemental brief on June 22, 2023. *See* ECF Nos. 23–24.

For the reasons below, the Motion is granted. ECF No. 20.

## I.    BACKGROUND

The Complaint alleges as follows.[3] Defendant, a California corporation with headquarters in El Cajon, owns a facility (the "Facility") in El Cajon that makes steel and other metal products. ECF No. 1 ¶¶ 15–17. Since at least July 25, 2017, Defendant has been discharging polluted stormwater into the San Diego River Watershed, of which Forester Creek and the San Diego River are a part. *Id.* ¶¶ 2, 10, 12–13, 16; *see id.* ¶¶ 61–64 (describing the types of pollutants).

Plaintiff is a citizen of California who, through his recreational activities, uses and enjoys the waters of Forester Creek and the San Diego River, including their inflows, outflows, and other waters of the overall San Diego River Watershed. *Id.* ¶ 9. Plaintiff also enjoys going to Cottonwood Grove Park, which is located downstream along these waters from the Facility. *Id.* ¶¶ 11–13. However, Defendant's operations have impaired Plaintiff's

---

copy of the proposed consent judgment" by the Department of Justice and by the EPA. 33 U.S.C. § 1365(c)(3).

[2]    On May 25, 2023, at a Status Conference before the Magistrate Judge, the Parties confirmed their intent to jointly move to dismiss the action without prejudice if the Court enters the proposed Consent Decree and retains jurisdiction to enforce it. ECF No. 21.

[3]    According to the Consent Decree, Defendant expressly denies all allegations in the Complaint and attached Notice Letter. ECF No. 20-1 at 3.

use and enjoyment of Forester Creek, the San Diego River, and Cottonwood Grove Park. *Id.* ¶¶ 10–14.

On July 25, 2022, as required by the CWA, Plaintiff provided notice of intent to file suit (hereinafter, the "Notice of Violation") for CWA violations to Defendant, the Administrator of the U.S. Environmental Protection Agency ("EPA"), and other state and federal agencies. *Id.* ¶ 5; *see* ECF No. 1-2 (Notice of Violation and Intent to File Suit Under the Clean Water Act).

On October 11, 2022, Plaintiff filed the instant citizen suit against Defendant under section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1). The Complaint alleged four violations of Clean Water Act, 33 U.S.C. §§ 1311, 1342, and of the General Industrial Stormwater Permits issued by the State of California (the "IGP")[4]: (1) discharges in violation of the prohibitions of the IGP; (2) discharges in violation of effluent limitations of the IGP; (3) failure to develop and implement an adequate Stormwater Pollution Prevention Plan ("SWPPP"); and (4) failure to develop and implement and adequate monitoring and reporting program. *See* ECF No. 1 ¶¶ 86–119. Plaintiff sought a declaratory judgment, injunctive relief, imposition of civil penalties, and award of costs. *Id.* ¶ 3.

## II.    LEGAL STANDARD

"A consent decree is 'essentially a settlement agreement subject to continued judicial policing.'" *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990) (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)); *see Lares v. Reliable Wholesale Lumber, Inc.*, No. 8:18-CV-0157-JLS-AGR, 2018 WL 6219936, at *2 (C.D. Cal. Oct. 18, 2018) ("Consent decrees are hybrids of private settlement agreements and public judgements.").

---

[4]    Specifically, Plaintiffs alleged violations of National Pollutant Discharge Elimination System ("NDPES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ (the "1997 Permit") and Order No. 2014-0057-DWQ (the "2015 Permit") (collectively, the "IGP"). ECF No. 1 ¶ 2. The IGP requires Defendant to test the Facility's stormwater discharges and collect stormwater samples annually. *Id.* ¶ 77.

"It is not a decision on the merits or the achievement of the optimal outcome for all parties, but is the product of negotiation and compromise. Consent decrees are often designed to be carried out over a number of years." *Oregon*, 913 F.2d at 580 (internal citations omitted).

Before approving a consent decree, a district court must determine that it is "at least fundamentally fair, adequate, and reasonable" and "conform[s] to applicable laws." *Id. Accord Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1165 (9th Cir. 2012). In applying the "fair, adequate, and reasonable" standard, courts examine both procedural and substantive fairness. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 834 F. Supp. 2d 1004, 1016–17 (D. Haw. 2011) ("*Turtle Island I*"), *aff'd*, 672 F.3d 1160 (9th Cir. 2012). *See also Arizona v. City of Tucson*, 761 F.3d 1005, 1012 (9th Cir. 2014) (stating that "fair" and "reasonable" are comparative terms). "To fulfill the public interest objectives of the CWA, a consent decree must actually further public environmental preservation. Courts should be skeptical of agreements which award plaintiffs and their counsel fees or other private gain but lack substantial injunctive relief or enforcement mechanisms." *Lares*, 2018 WL 6219936, at *2 (citing *Staton v. Boeing Co.*, 327 F.3d 938, 952–53 (9th Cir. 2003)).

"As long as the consent decree comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate[] the statute upon which the complaint was based, the parties' agreement may be entered by the court." *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990) (internal quotation marks omitted). Approval of a proposed consent decree is within the sound discretion of the court. *See Oregon*, 913 F.2d at 580.

## III.    ANALYSIS

### A.    *Procedural Fairness*

In reviewing the Parties' Consent Decree for procedural fairness, the Court has the duty to ensure that "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Oregon*, 913 F.2d at 586 (citing *Officers for Justice*, 688 F.2d at 625). Here, the Consent Decree is the result of several months of arm's-

length negotiation, beginning shortly after the filing of the Complaint. *See* ECF Nos. 7, 9, 11, 13; ECF No. 23 at 7. As part of the settlement discussions, Plaintiff's expert environmental consultant conducted an inspection of the Facility on December 22, 2022. ECF No. 13 at 2. In February 2023, Plaintiff's expert produced a report based on that site inspection which was further used in their discussions. *Id.* Specifically, Plaintiffs' expert recommended several revisions to the SWPPP and best management practices "to further reduce pollutants in stormwater discharges at the Facility and achieve full compliance with the IGP and CWA." ECF No. 23 at 6–7; *see* ECF No. 24 ¶ 11. These recommendations formed the basis of the injunctive relief agreed to in the Consent Decree, and "include such concrete measures as installation of permanent flow barriers, infill trenches, asphalt berms, and stormwater inlets, amongst other measures designed to alleviate stormwater issues at the Facility." ECF No. 24 ¶ 12; *see* ECF No. 20-1 at 5–11.

Further, the Parties represent that Defendant has diligently and in good faith significantly addressed and continues the address those concerns raised by Plaintiff in their Notice Letter. ECF No. 20-1 at 2. To that end, the Consent Decree seeks to implement pollution control measures as well as monitoring and reporting requirements, among other things. *See id.* at 5, 10. Based on the information before the Court, there is nothing to suggest that the Consent Decree resulted from anything other than "good faith, arms-length negotiations." *See Oregon*, 913 F.2d at 581.

The Court therefore concludes that the Consent Decree is procedurally fair.

**B.    *Substantive Fairness***

"In evaluating the substantive fairness of a consent decree in an environmental case, it is important for the district court to be fully informed regarding the costs and benefits of the decree." *United States v. Chevron U.S.A., Inc.*, 380 F. Supp. 2d 1104, 1113 (N.D. Cal. 2005) (citing *United States v. Montrose Chemical Corp. of Cal.*, 50 F.3d 741 (9th Cir. 1995)). However, "[i]t is not the duty of the court to determine whether 'the settlement is one which the court itself might have fashioned, or considers ideal.'" *Turtle Island I*, 384 F. Supp. 2d at 1017 (citing *Chevron*, 380 F. Supp. 2d 1 at104, 1111). Rather, a court's

approval "is nothing more than an amalgam of delicate balancing, gross approximations and rough justice" and "the court need only be satisfied that the decree represents a reasonable factual and legal determination." *Oregon*, 913 F.2d at 581 (internal quotation marks omitted).

Here, the Consent Decree provides for injunctive relief aimed at reducing the pollutant levels in the stormwater discharged from the Facility and promoting compliance with the IGP. ECF. No. 23 at 6; *see* ECF No. 20-1 at 5–10. Specifically, the Consent Decree requires Defendant to (1) appoint a Qualified Industrial Storm Water Practitioner; (2) install a permanent barrier to prevent discharge of stormwater onto the neighboring property; (3) infill the trench located along the south edge of the Facility to eliminate stormwater discharge onto the neighboring property and minimize sediment transport and erosion; (4) install an asphalt berm to prevent stormwater run; (5) seal curbside inlets on the north side of the Facility to prevent stormwater discharge from these outlets; (6) revise the SWPPP to include specific measures and ensure the SWPPP's implementation at the Facility; (7) acknowledge that certain provisions of the IGP apply to the Facility and continue to act in conformity with the IGP and the SWPPP; (8) install and maintain a recording rain gauge; (9) maintain records of all maintenance of the rain gauge and rain data; (9) review Defendants' Monitoring and Reporting Plan for all stormwater discharges from the Facility to determine whether its current plan meets the requires of the Consent Decree and the IGP; (10) submit any revisions to its Monitoring and Reporting Plan to Plaintiff for review and comment; (11) collect samples of any "Qualifying Storm Event," as defined in the IGP; (12) conduct and document visual observations; and (13) give notice when Defendant submits to Annual Report to the State Board each year. *See id.*

Additionally, the Consent Decree has several monitoring and reporting requirements: (1) Plaintiff may conduct an inspection of the facility once during the life of the Consent Decree and will provide Defendant with any comments upon completion thereof; (2) Defendant shall make a one-time payment of $7,500 for costs and fees incurred for monitoring Defendant's compliance with the Consent Decree; and (3) Defendant shall

give Plaintiff notice of all documents related to stormwater quality at the Facility that are submitted to the Regional Board, the State Board, and/or any state or local agency, county, or municipality. *Id.* at 10–11.

Under the Consent Decree, Plaintiff may seek judicial enforcement of its terms after a meet and confer process with Defendant. *Id.* at 13. The Consent Decree terminates two years after the effective date (i.e., the date the Consent Decree is entered), and includes a release of claims provision for Plaintiff, in his additional capacity, as well as nonparties who may bring an action based on any violation of the CWA that was alleged in the Complaint or that could have been brought pursuant to the Notice of Violation. *Id.* at 5, 14. Nothing in the Consent Decree, however, waives the rights of the United States to enforce its rights under federal law. *Id.* at 14.

As discussed above, the Consent Decree is the result of negotiation, "the terms of which reflect the relief prioritized by the parties." *See Turtle Island I*, 834 F. Supp. 2d at 1017. The Parties represent that, prior to the issuance of the Notice of Violation, Plaintiff conducted an extensive investigation, which included review of California's online Storm Water Multiple Application and Report Tracking System ("SMARTS") database, PACER California registration records, EPA benchmarks and water quality standards, and National Oceanic and Atmospheric Administration rain data. ECF No. 23 at 4; ECF No. 24 ¶ 6. Plaintiff also hired an expert to inspect and photograph the discharge points at the Facility. ECF No. 24 ¶ 6. Plaintiff's Notice of Violation provided specific detail regarding Defendant's alleged violations, including where and when those violations were likely to have occurred. ECF No. 23 at 5. *See* ECF No. 1-2 at 3–9. These allegations, which are neither generalized nor conclusory, were also included in the Complaint. *See* ECF No. 1. *See also Lares*, 2018 WL 6219936, at *2 (noting that "[w]ere the allegations of environmental degradation merely 'generalized and conclusory,' lacking specific facts indicative of potential CWA violations, then the Court would question the [defendant's] ability to remedy such nebulously-defined harm."). The Notice of Violation, Complaint, and the Parties' joint supplemental briefing on the pending Motion "plainly detail specific

instances of action (or failures to act) that are ripe for injunctive relief." *See Lares*, 2018 WL 6219936, at *2. The Consent Decree thus "comes within the scope of the pleadings, [and] furthers the broad objectives upon which the complaint was based." *See Sierra Club*, 909 F.2d at 1355. Accordingly, the Court concludes that the Consent Decree is substantively fair.

### B.    Conformity to Applicable Laws and Public Policy

The Court turns to whether the Consent Decree conforms to applicable laws and public policy. While a consent decree must conform to applicable laws, it does not need to impose all the obligations authorized by law. *Oregon*, 913 F.2d at 581. Courts also have a duty to protect the public interest that is implicated by a consent decree, but the decree does need to be "in the public's *best* interest" if it is otherwise reasonable. *Id.* (quoting S.*E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984)) (emphasis in original).

The purpose of the Clean Water Act is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Consistent with this purpose, the Consent Decree requires concrete measures to reduce pollutants from stormwater discharges at the Facility and achieve full compliance with the IGP and CWA—including installation of permanent flow barriers, infill trenches, asphalt berms, and stormwater inlets, among other measures. *See* ECF No. 23 at 7. The Court is satisfied that implementation and enforcement of these measures through the Consent Decree will promote the public interest in a cleaner San Diego River Watershed and further the goals of the CWA. *See Lares*, 2018 WL 6219936, at *2 ("[T]he Court's duty today is to ensure that the public's interest in pollution-free waterways is furthered by an otherwise private agreement."). *Cf. Sierra Club*, 909 F.2d at 1355 (finding a district court abused its discretion in failing to enter a proposed consent decree that "further[ed] the purpose of the statute upon which the complaint was based and does not violate its terms or policy").

### IV.    Economic Components of the Consent Decree

In addition to the injunctive relief discussed above, the Consent Decree requires Defendant to pay (1) a $5,000 supplemental environmental project payment to the Regents

of the University of California, San Diego ("UCSD"),[5] and (2) $60,000 in attorney's fees and costs to Plaintiff's counsel. ECF No. 20-1 at 12. The provisions of the CWA "provide no limitation on the type of payments to which parties to citizens' suits can agree in a settlement." *Sierra Club*, 909 F.2d at 1356. For the reasons below, the Court concludes that both payments as set forth in the Consent Decree should be granted.

### A.    Supplemental Environmental Project Payment

According to the Consent Decree, the $5,000 payment to the Regents of UCSD will fund UCSD Extension's Industrial Compliance workshop program, which provides training needed to achieve and maintain compliance with the IGP at industrial facilities in California, including those facilities whose stormwater runoff affects the overall San Diego region. ECF No. 20-1 at 12. On April 3, 2023, the Parties provided a letter from UCSD Extension which confirmed that the entity receiving these funds was a tax-exempt entity under section 501(c)(3) of the Internal Revenue Code; stated that UCSD Extension had read the Consent Decree; and detailed how the funds would be spent.[6] ECF No. 24 ¶ 14. The DOJ confirmed on April 4, 2023 that it had received the Consent Decree and has not objected to it by filing in the instant action or otherwise communicating its opposition to the Parties. *See* ECF No. 24 ¶¶ 15–16.

Given the Plaintiff's allegations in the Complaint, the Court concludes that payment to fund the UCSD Extension's Industrial Compliance workshop "will help further the goals

---

[5]    The supplemental environmental project is "[t]o remediate the alleged environmental harms resulting from non-compliance with the 1997 Storm Water Permit and IGP alleged in the Complaint." ECF No. 20-1 at 12.

[6]    "Where a proposed consent decree provides the payment of money to a third party for a supplemental environmental project, the United States asks the third party to confirm that it: (1) is a § 501(c)(3) tax-exempt entity; (2) has read the proposed consent judgment; (3) will spend any money it receives for the purposes specified in the judgment; (4) will not use any money received for political lobbying activities; and (5) will submit a letter to the United States describing how the funds will be spent." *San Joaquin Raptor/Wildlife Rescue Ctr. v. QG Printing II LLC*, No. 120CV01412DADBAM, 2021 WL 5727059, at *2 (E.D. Cal. June 16, 2021).

of the [Clean Water] Act." *See Sierra Club*, 909 F.2d at 1355 (noting that Congress encourages settlements "which preserve the punitive nature of enforcement actions while putting funds collected to use on behalf of environmental protection").

### B.    Attorney's Fees and Costs

Section 505(d) of the CWA provides: "The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). "In order to award attorney's fees under § 1365(d), a district court must make two findings. First, it must find that the fee applicant is a 'prevailing or substantially prevailing party.' Second, it must find that an award of attorney's fees is 'appropriate.'" *Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1058 (9th Cir. 2009). The Court addresses each in turn.

### 1.    Whether Plaintiff is the Prevailing or Substantially Prevailing Party

In the joint supplemental briefing, the Parties argue that Plaintiff is the prevailing party because there is no dispute that (1) the Court retains jurisdiction to enforce the terms of the Consent Decree; (2) Plaintiff has achieved relief on the merits of his claims by obtaining the injunctive relief in the Consent Decree; and (3) entry of the Consent Decree will legally require Defendants to implement the injunctive relief. ECF No. 23 at 9. The Court agrees. *See Saint John's*, 574 F.3d at 1059 (holding that a litigant qualifies as a prevailing party if it obtains judicially enforceable actual relief on the merits of its claim that materially alters the legal relationship between the parties).

Notably, "[t]he threshold for sufficient relief to confer prevailing party status is not high. *Id.* at 1059. "If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind." *Id.* Here, Plaintiff's requested relief in the Complaint included enjoining Defendant from discharging pollutants from the Facility to stormwater discharge points and ordering Defendant to restore all receiving waters

damaged by discharge of pollutants from the Facility. *See* ECF No. 1 at p. 27–28. As previously discussed, the measures required in the Consent Decree aim to provide this relief.

### 2.    *Whether the Award is Appropriate*

The Consent Decree provides that Defendant will pay $60,000 to Plaintiff's counsel for "investigation fees and costs, expert/consultant fees and costs, and reasonable attorney's fees incurred as a result of investigating and preparing the lawsuit and negotiating this Consent Decree." ECF No. 20-1 at 12. In the Ninth Circuit, "the district court may deny attorney's fees to a prevailing plaintiff under § 1365(d) only where there are 'special circumstances'" that would render an award unjust. *Saint John's*, 574 F.3d at 1062–64 (holding that the standard applies "to a request for attorney's fees by a prevailing plaintiff under the CWA").[7] The Parties represent that such "special circumstances" are not present here, and the Court cannot conclude that the "narrow" exception to an award of attorney's fees under § 1365(d) otherwise applies. *See* ECF No. 23 at 9–10.

Further, the Court "need not enter the minefield of hours, rates, and lodestar calculations and adjustments because no fee petition is at issue." *See Lares*, 2018 WL 6219936, at *4. In the "context of the time, effort, and skill required to negotiate the [Consent Decree], and in proportion to the relief achieved," the Court concludes that the $60,000 award is appropriate. *See id.* (finding that "a $54,000 award both reasonable and consistent with public policy" in a CWA action).

/ / /

/ / /

/ / /

---

[7]    The Parties note that the "special circumstances" standard has "only been applied when a prevailing party has applied to the Court for fees where, unlike here, the parties did not reach agreement on the fees and the court had to determine the amount, if any." ECF No. 23 at 10 n.11.

1  **V.    CONCLUSION**

2      For the foregoing reasons, the Court **GRANTS** the Parties' joint Motion and will

3  enter the Consent Decree. ECF No. 20.

4      **IT IS SO ORDERED**.

5

6  Dated:  July 12, 2023

7                                          Hon. Robert S. Huie
                                           United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22-CV-01553-RSH-DDL